UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**INTERNATIONAL ALLIANCE OF
THEATRICAL STAGE EMPLOYEES,
LOCAL 18, AFL-CIO-CLC**,

        Plaintiff,

v.                                           **Case No. 06-C-1219**

**MILWAUKEE REPERTORY THEATER, INC.,**

        Defendant.

---

## DECISION AND ORDER

---

Furniture or not furniture: that is the question. The question comes to this court as a result of the Milwaukee Repertory Theater's ("Rep") production of *King Lear*, a production where the conflict was not limited to the stage. Although perhaps not of Shakespearian proportion, the conflict that is presented in this case began during the pre-production phase of the play and involved the construction of a trunk. When it came time to set the stage for the production, the scene builders for the Rep, members of the plaintiff union, characterized the trunk as furniture and thus, pursuant to the collective bargaining agreement ("CBA"), argue that it should have been constructed by union members. However, the trunk was built by the non-union employees of the properties ("prop") shop based upon the opposing view that the trunk was luggage.

Luggage or furniture: One might ask, "What's in a name?" The short and the long of it is that the difference between luggage and furniture amounts to less than two-hundred dollars from the union's perspective, for that is the amount at the root of this dispute. That it should come to this, a federal lawsuit and trial over what the court has calculated to be less than two-hundred dollars, is likely a consequence of the fact that the CBA lacks any substantive dispute resolution procedures.

Although some may regard such litigation to be madness, particularly when substantially more than the amount at issue was paid in filing fees alone, the court nonetheless suspects there may be method in it. Seeking a clear definition of contract terms, in this case, the word "furniture," may be an alternate goal of the litigation. Or, possibly learning a lesson from the time and expense of this federal litigation to encourage the parties to incorporate an alternative method of dispute resolution into their next CBA. may be another goal.

In the court's opinion, both are laudable goals, but to accomplish either will be up to the parties. This is because the court is only able to resolve the exact dispute presented, and that is of a rather limited nature. In determining the issue before the court, whether the trunk is furniture under the CBA, simply stated, the play's the thing. That is, whether or not the *King Lear* trunk is furniture under the CBA depends upon how the trunk is used in the play. In the present case, based upon the evidence adduced at trial, it is clear to this court that the trunk was originally intended and ultimately used as luggage, not furniture, and thus the CBA did not require that it be constructed by the union members in the scene shop.

Mindful that brevity is the soul of wit and men of few words are the best men, the court shall set forth a summary of the evidence presented at trial.

## TRIAL SUMMARY

This case involves a labor organization's suit against an employer for an alleged violation of a labor contract, and therefore this court has original jurisdiction over this matter pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. The plaintiff originally filed this action before the Wisconsin Employment Relations Commission, which acts as the state court for such actions pursuant to the Wisconsin Employment Peace Act. See Wis. Stat. § 111.07. The defendants removed the case to federal court pursuant to 28 U.S.C. §§ 1441 and 1446. The case was randomly assigned to this court and all parties consented to the full jurisdiction of a magistrate judge.

On April 4, 2007, a one-day trial to the court was conducted, during which the court received testimony from three witnesses. Following the trial, the court ordered the parties to submit simultaneous briefs no later than May 14, 2007. In accordance with the agreement between the parties, the court ordered that no responses or replies would be filed.

The conflict focuses upon Article 11 of the CBA which states, in pertinent part, that

> [t]he trade jurisdiction of this Agreement shall include Union stage employees whose duties will include the preparation, handling, building, maintenance and repair of all backgrounds, scenic sections, platforms and other structures forming part of the scenery or settings used in connection with the entertainment portion of the performance; [and] **the construction of furniture** for use on the set in connection with stage performances; . . . . Only Union stage employees covered under this Agreement shall perform the duties in the above trade jurisdiction. (emphasis added)

**James Guy**

James Guy ("Guy"), the manager of the Rep's prop shop, was called both by the plaintiff and the defense. Set forth below is a summary of all of his testimony.

Guy has a masters degree in stage management, and has worked in theaters since 1978 in various capacities throughout the Midwest, including as a prop carpenter and prop master. He has taught graduate-level courses regarding theater crafts at the University of Illinois at Urbana-Champaign and owned and operated his own prop business doing props for stage and advertising. Guy is active in various theater professional organizations. He has worked for the Rep for the past eight seasons. Out of the twelve to fifteen different theaters that Guy has worked in, the Rep is unique in its having the scene shop construct furniture; ordinarily, all furniture is made by the prop shop.

When asked to describe what a "prop" is, Guy analogized the set to an empty house. Everything that goes into that empty set is a prop. These props give character and purpose to the set and begin to tell a story without using words. Furniture and luggage are both props. Guy defined luggage as a container that holds or appears to hold items for travel, regardless of size. When asked to offer a definition of

furniture based upon his theater experience, Guy said, "I guess it would be those furnishings that go onto a set to make it a living or working environment." (Tr. 45.)

There are various types of luggage that have been used by the Rep over the years ranging from small shoulder bags to large wooden trunks and everything in between. All varieties of luggage may be custom-constructed by the prop shop if an appropriate piece cannot be found to be purchased. The type of luggage utilized will depend upon the specifics of the play. The *King Lear* trunk was a period piece, designed to appear as if it was from the 14th Century. The trunk was designed to be consistent with what one would expect a King to utilize to hold his belongings as he ventured off into self-imposed exile. It was constructed of wood with two brass colored metal ring-style handles on each end. Two smaller brass colored metal ring-style handles are on both the front and back of the trunk. The wood of the trunk is stained a dark brown and there is a metal panel on the upper center of the front of the trunk that has a hole for a key. A lattice work appears to have been installed over the exterior panels dividing each side into fifteen smaller panels and each end into nine panels, all of equal size. At each intersection of the lattice there is a metal rivet. The approximate dimensions of this trunk are 4 feet wide by 22 inches deep by 25 inches high. This trunk was received as exhibit 4 (although the parties agreed to withdraw the trunk following the court's inspection) and photographs of this trunk were received as exhibits 7 and 1001.

Originally, the *King Lear* trunk was conceived as being smaller and simply one of numerous other trunks. But as production preparation progressed, the decision was made to utilize a larger trunk instead of numerous smaller trunks. Originally the trunk was designed to open and characters in the play were to remove certain items from it but this plan also changed and eventually the lid was screwed shut for safety reasons.

Trunks have frequently appeared on stage in Milwaukee Rep productions. Sometimes these trunks were simply purchased and then perhaps modified. At other times, these trunks were constructed, sometimes by the scene shop and at other times by the prop shop. The trunk most frequently discussed

at trial, aside from the *King Lear* trunk, was a trunk made by the scene shop for *The Crucible* in 2004. This trunk was received as exhibit 6 and again the parties agreed to withdraw it following the court's inspection. Photographs of this trunk were received as exhibit 8.

The *Crucible* trunk, frequently referred to as a "blanket chest," was made by the scene shop and was utilized as prop for a scene of an interior of a small New England cottage or farm house of the 1600's. It was part of various other items such as a large table, benches, a chair, stools, and a hearth piece. This piece was designed by Guy, who considered it furniture because it was not used for travel but rather was designed to sit in the home. This trunk is plainer than the *King Lear* trunk in that it is lacks the lattice work and metal accoutrements. There is a single handle on either end and front panel is subdivided into two equal panels by a piece of wood running vertically down its center. Directly above this dividing piece of wood there is a keyhole. The approximate dimensions of this trunk are 36 – 40 inches wide by 22 inches deep by 10 – 20 inches deep.

Guy also briefly mentioned trunks in other Rep productions. In *Carolin', Carolynne*, a large steamer trunk that was previously owned by the Rep was utilized. Guy considered this trunk luggage because the character was a traveling performer and the trunk was where she stored her props and costumes. For *Servant of Two Masters,* the prop shop constructed three almost identical trunks, two of which were relatively ordinary, treated as luggage, and the third of which was specially designed to permit an actor to fall through a trap door in the stage, pull a lever, and then the trunk would fall flat. Photographs of these trunks were received as exhibit 1050.

In *Blues for an Alabama Sky*, a character was a costume designer and these costumes were stored in the trunk as the character moved from place to place. This was a travel trunk which was previously purchased or donated and pulled from stock. Similarly, the trunk used in *Anna Karenina* was store bought luggage, as was the trunk utilized in *The Bachelors*, although it was reinforced. A number of pieces of purchased luggage were utilized in a scene set on the docks of Argentina in *The Magic Fire*.

Various trunks of differing sizes were utilized in scenes including a room in an inn, below deck of a ship, and on docks in *Moby Dick*. All of these trunks were made by the prop shop.

*Mary Stewart* and *Richard III* were performed in true repertory, on alternating nights. *Richard III* utilized a large trunk that was built by the prop shop. The *Richard III* trunk was similar to the *King Lear* trunk in that it was designed to create the impression that it was carrying the property of royalty. Although an actor sat on the trunk in *Richard III*, Guy testified that this did not change his understanding of what was luggage versus furniture. The *Mary Stewart* trunk, also constructed by the prop shop, was intended to contain the protagonist's personal effects as she traveled from France to England and eventually to prison. This trunk was specially designed to permit a soldier to smash a center panel with an axe in order to open it.

Guy recalls a conversation with Sam Garst regarding the *King Lear* trunk and recalls saying that he believed the prop was luggage in response to his concerns that the prop was furniture. However, Guy does recall discussing how the prop had grown over the course of rehearsals. Although Guy did not personally build it, he recalls that it took about eight hours to build the *King Lear* trunk.

**Sam Garst**

Sam Garst ("Garst") is in his twenty-third season with the Rep. He has been a member of the plaintiff union since 1995 and is currently the shop steward. Prior to working in his current position, he was the non-union manager of the prop shop, which is currently James Guy's position.

When Garst first saw the *King Lear* trunk, he discussed the matter with Guy who, according to Garst, said that the scene shop should have built the piece but explained that the trunk was originally envisioned as a smaller piece but had evolved into a larger piece during rehearsal. Garst testified that he made efforts to discuss his concerns regarding the construction of the trunk with the Milwaukee Rep's production manager but these efforts proved unsuccessful.

Garst further discussed other similar trunks made by the scene shop, such as a trunk for *Holy Moses* that was slightly larger than the *King Lear* trunk and had a "magic panel" on the side, a trunk for a production called *The U.S.O.*, which held props that were used on stage for this cabaret style show, and a trunk from *The Devil's Disciple*. The court also received two photographs of the trunk created by the scene shop for a 1985 production of *The Devil's Disciple* as exhibit 9.

Following the prop shop's construction of the *Mary Stewart* trunk, the union argued that the construction of this trunk was properly within the trade jurisdiction of the union. In an effort to head off such future conflicts, the parties agreed to increase communication in the form of pre-production meetings. The parties recognized that problems were most likely to arise in plays that were the first production of the season. *Mary Stewart* was the first production of the season as was *King Lear*. There was no pre-production meeting for *King Lear*.

**Timothy Shields**

Since 1998, Timothy Shields ("Shields") has been the managing director of the Milwaukee Rep. In this role he has served as chief negotiator on behalf of the Rep in its negotiations with various unions. Shields' testimony largely focused upon the negotiation of the CBA and particularly Article 4 relating to "Management Rights."

The court shall not recount Shields' testimony in detail because, as discussed below, this testimony is not relevant to the issue presented. It is sufficient to say that as part of negotiating the CBA, Article 4 was included which deals with management rights and the incorporation of past practices into the CBA. The union wrote down all the past practices that it could think of and those practices were incorporated into the CBA. Section C of Article 4 established that if during the course of the contract the union recognized additional past practices that were not incorporated into the contract or had other disputes regarding past practices, the parties agreed to meet and attempt to resolve such disputes.

# DECISION

The court will give contract terms their ordinary and popular meaning and avoid turning to extrinsic evidence when presented with unambiguous language. UAW v. Rockford Powertrain, Inc., 350 F.3d 698, 703 (7th Cir. 2003) (quoting Diehl v. Twin Disc, 102 F.3d 301, 306 (7th Cir. 1996)). Furniture is defined in Webster's II New Collegiate Dictionary as, "The movable articles in a room or establishment that make it fit for use." The American Heritage College Dictionary (3d Ed.) contains a nearly identical definition, but at the end of the definition simply substitutes "living or working" in place of "use." The dictionary definitions are not different than the way in which James Guy defined furniture. Although Guy's testimony was criticized by the plaintiff as having been "created" for this litigation, it is one based on his years of experience in the theater. The fact that it was voiced during this litigation should not detract from its utilitarian approach. Both the dictionary and Guy present a working definition, one that should be amenable to future application, if the parties choose to agree.

Ordinarily, under such a definition, whether an object is furniture or luggage is clear. A desk or table will likely always be appropriately called furniture; items such as backpacks or briefcases will never be furniture. However, the court recognizes that there is a gray area when it comes to items such as trunks and chests.

The court finds no ambiguity when it comes to the definition of furniture, nor should there by any ambiguity in applying this definition to a specific trunk in a particular production. But, the timing of the application is the key. This is because a certain ambiguity has developed with the characterization of trunks and chests. For example, trunks and chests are commonplace and utilized as furniture in today's homes. In fact, both the *Crucible* and *King Lear* trunks, despite being made simply as props for plays, are nonetheless finely crafted and could be attractive additions to the furniture collections of many homes. Paging through most any catalog of home furnishings will reveal a number of trunks or chests being sold as furniture. Surely, it would be extremely unlikely for a person to utilize any of the trunks

and chests found on the pages of the Pier 1 or Pottery Barn catalogs as luggage. However, there is no disputing the fact that trunks and chests were historically commonly utilized as transport containers. But over time, the utility of these objects declined and antique originals and modern reproductions have become fashionable as furniture. Thus, trunks or chests may be either furniture or luggage.

In fact, at the Rep, the same trunk may at one time be furniture and another luggage. As was made clear during the trial of this matter, when a prop is acquired or constructed by the Rep, it is not disposed of following the close of the play in which it was used. Rather, it is stored for potential reuse in a subsequent production. Thus, in a future production, the *King Lear* trunk may reappear on stage, perhaps as part of the background illustrating the character of the setting, or perhaps in a similar manner as it was used in *King Lear*, indicating that it held the possessions of royalty venturing off on a journey. The same trunk, yet two different roles; it too, like the fine cast and crew of the Milwaukee Rep, is capable of seamlessly shifting into a different storyline to fulfill the needs of possibly wildly divergent productions.

That is why the timing is key. Obviously, a trunk is constructed just once, although it can be subsequently modified. An object's use may change over time, from one production to the next or even within the same production, but whether an object is furniture under the trade jurisdiction of the union must be determined by analyzing the intended use of the object at the time of the construction. Article 11 of the CBA pertains to the "construction of furniture." Whether a particular trunk is furniture and thus under the trade jurisdiction of the union will depend upon the trunk's intended use in the play when it is built. Parenthetically, to avoid disputes such as the present one, it is incumbent upon the parties to discuss this matter at the outset of a production. As the evidence has shown, when this was done, disputes were avoided. By the same token, as this case exemplifies, these attempts at full communication have been lacking, especially in regard to the first production of the season. Needless to say, there remains room for improvement.

Addressing the *King Lear* trunk, the evidence presented at trial makes clear that at the time the trunk was constructed, the intent was that it be utilized as a piece of luggage and not furniture. It was conceived as being one of a number of smaller trunks, all of which were intended to convey the impression of containing the King's possessions as he ventured off into self-imposed exile. And in the eventual production, the trunk was still utilized as luggage. As described in the testimony at trial, as the King was preparing to go off into exile, the trunk appeared on stage carried by two of King Lear's knights. The knights carried their own luggage in the form of sacks. Granted, the trunk was luggage fit for a King, but luggage nonetheless. If the time period had been different, no doubt a King would have used different luggage. But in fourteenth-century England, it is entirely reasonable that royal luggage would include a large finely-crafted and relatively intricate trunk.

Additionally, turning to the definition of furniture, there is no indication that the trunk was utilized as a "movable article[ ] in a room or establishment [to] make it fit for use." Rather, the setting in which the trunk was utilized was out of doors, specifically at a dock where the King was preparing to venture off into self-imposed exile. Further, the trunk did not, in any way, make the dock "fit for use" but instead was present to facilitate the King's journey, albeit not literally so.

By way of comparison, use of this trunk is quite different from how the chest or trunk was used in *The Crucible*. The *Crucible* trunk sat in the background as part of a set designed to appear to be the interior of a seventeenth-century cottage and fell squarely within the definition of furniture. In no manner was this trunk ever intended to be or utilized as anything other than furniture. It contributed to the story in much the same way that props such as a desk or a chair may by possibly communicating such things as identifying the space in which the action was occurring, setting the time period, or conveying the status of the persons in the space. Thus, it was properly within the trade jurisdiction of the union.

The *Crucible* and *King Lear* trunks are the only two trunks about which the court received substantial evidence regarding how they were utilized in their respective productions. As for the

numerous other trunks and chests briefly referenced during trial, the court finds that the fact that the scene shop or the prop shop made a particular item in the past bears only minimal relevance to the question of whether that particular item was in fact constructed by the proper shop according to the CBA. It is clear that there was no standing definition as to what was furniture. Thus, different persons may have had different understandings of this contract term. For example, Garst, currently the head of the scene shop, was previously the manager of the prop shop. Many of the other trunks discussed were made during his tenure at the helm of the prop shop and thus whether or not an item was made by the scene shop or the prop shop likely reflected his understanding of the term "furniture." Perhaps he had or has a more liberal understanding of the term than that of Guy, the current manager of the prop shop. Additionally, Guy testified that when the prop shop is overloaded it may call upon the scene shop for help. (Tr. 79-80.) Thus, it is possible that when the union made a particular item it was the result of the prop shop's request rather than an understanding that the construction was contractually required.

The Rep discusses at length Article 4, Section C of the CBA, which requires the union and management to meet and discuss resolutions to disputes over "past practices." Thus, the Rep argues, because the union did not meet to discuss this dispute with management, this case is not properly before the court. The union argues that this case is not a matter of past practice but rather a specific question of contract interpretation relating to question of whether this specific trunk constitutes furniture as that term is used under the CBA.

The court does not regard the present dispute as a dispute over past practices that would be covered under Article 4, Section C of the CBA. From the testimony at trial, it is clear that the Rep was concerned with situations in which the union opposed management's action not because of any specific provision in the CBA but rather because things had always been done another way. Management tended to change more frequently than union leadership and thus when the union asserted that past practice was different than what management wanted, management lacked the necessary historical knowledge to

disagree with the union. Thus, "from management's point of view [past practices] were defined as being whatever the union said they were." (Tr. 156.) The Rep sought to remedy this concern by including Article 4 in the CBA and formally incorporating in the CBA as many past practices as the union could recall. Examples of past practices regarding the duties and responsibilities of the union that were not previously incorporated into the CBA include the past practice for union stagehands to mop the stage before a performance because years ago, a janitor cleaning the stage prior to a performance cleared away the trash and debris that had been intended to be part of the set. Other past practices include prohibitions on management being involved in physical work on stage or in the shop and that a union carpenter or stagehand is required for any play that involves multiple sets. (Ex. 1007.)

These extra-contractual obligations were what management sought to codify in the CBA. In the event the union later recalled a past practice that it did not recall in time to incorporate it formally into the CBA, Section C required discussion and cooperation regarding the dispute rather than the previous approach where the union unilaterally asserted that a matter was a past practice and management was not in a position to disagree.

The union is not arguing that the trunk fell within its trade jurisdiction by virtue of past practice, but rather argues that the trunk was within its contractual trade jurisdiction as a piece of furniture, construction of which the CBA explicitly states must be done by the union. Therefore the question presented to the court is the narrow one of whether the trunk constructed for the production of *King Lear* constitutes furniture as that term is used in the CBA. That is not to say that what the union and management did in the past is not relevant to the present dispute. Just as Guy turned to his prior knowledge and experience in the theater when he offered his definitions of furniture and luggage, the union and the Rep are relying upon prior trunks and chests in order to aid in the resolution of the issue of whether the *King Lear* trunk was furniture or luggage. The court does not find this resort to past practices by the parties to be covered under Section C, and therefore the union was not required to
Case 2:06-cv-01219-AEG    Filed 05/22/07    Page 12 of 13    Document 25

comply with Section C. Rather, this sort of extrinsic historical information of the parties' prior course of dealing and course of performance under the contract simply aids the court in determining the meaning of the contract term "furniture"as it is applied to trunks.

Therefore, in weighing the evidence presented, applying a common and an ordinary definition of the word furniture, and reviewing the trade usage of this word and the parties' prior dealings and conduct under the CBA, as these factors relate to similar trunks and chests, it is the conclusion of the court that the trunk constructed for the Rep's production of *King Lear* was not furniture and therefore not within the exclusive trade jurisdiction of the plaintiff union.

**IT IS THEREFORE ORDERED** that the plaintiff's complaint is **dismissed**. The clerk shall enter judgment in favor of the defendant and against the plaintiff.

Dated at Milwaukee, Wisconsin, this 22nd day of May, 2007.

s/AARON E. GOODSTEIN<br>
U.S. Magistrate Judge